**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF EDUCATION, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 17-4433 |
| D.E., individually and on behalf of A.H.D. and A.D., | : : : : | |
| Defendant. | : : | |

| | | |
|---|---|---|
| DARLINE E., individually and on behalf of Az.D. and Am.D., | : : : : | |
| Plaintiff, | : : | |
| v. | : : : | |
| PEDRO RIVERA, in his official capacity as Secretary of Education for the Commonwealth of Pennsylvania Department of Education, and COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF EDUCATION, | : : : : : : : : | |
| Defendants. | : : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **APRIL 5, 2019**

　　　　This consolidated action stems from a Pennsylvania hearing officer's order instructing

Plaintiff Commonwealth of Pennsylvania Department of Education ("PDE") to reimburse two

educational trust funds and resolve an unpaid private school tuition reconciliation that Young

Scholars Kenderton Charter School ("Kenderton Charter") allegedly owed to the Y.A.L.E.

School ("Y.A.L.E.").[1]  PDE's only remaining claim in this case is against Defendant D.E. ("Parent") under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, which seeks reversal of the Office of Dispute Resolution ("ODR") hearing officer's orders requiring PDE to reimburse the educational trust accounts and pay the tuition reconciliation.  Parent also has a claim seeking attorney's fees, litigation costs, and enforcement of the hearing officer's decision.

Presently before the Court are PDE's Motion for Summary Judgment against D.E., Individually and on behalf of A.H.D. and A.D., and Parent's Motion for Judgment on the Administrative Record.[2]  For the reasons detailed below, PDE's motion is denied and Parent's motion is granted to the extent it can be construed consistent with an appropriate modification of the hearing officer's order.

I. **BACKGROUND**

Parent is the mother of A.H.D. and A.D. (collectively, "Students"), who are eligible for special education and related services under the IDEA.  (Pl.'s Mem. Law in Supp. Mot. Summ. J. 2; Def.'s Resp. in Opp'n Mot. Summ. J. 2–3.)  Initially, both Students attended elementary school in the School District of Philadelphia ("the District").  (Def.'s Resp. in Opp'n Mot. Summ. J. 3.)  The District was their Local Education Agency ("LEA") until the summer of 2013,

---

[1] On November 3, 2017, Defendant D.E. ("Parent") filed an action styled as *Darline E., individually and on behalf of Az.D. and Am.D. v. Pedro Rivera, in his official capacity as Secretary of Education for the Commonwealth of Pennsylvania Department of Education, and Commonwealth of Pennsylvania, Department of Education*, Civil Action No. 17-4966, which was assigned to the Honorable Petrese B. Tucker.  Parent's Complaint in that action sought attorney's fees, litigation costs, and enforcement of the hearing officer's award of tuition reimbursement and payment of tuition.  By Order dated February 28, 2018, then-Chief Judge Lawrence F. Stengel transferred Civil Action 17-4966 to the undersigned and consolidated the actions under Civil Action 17-4433.  (*See* Doc. No. 13.)

[2] After briefing commenced concerning these motions, PDE and Y.A.L.E. reached a settlement agreement, discussed in detail below.  Thus, pursuant to Federal Rule of Civil Procedure 41(b), Y.A.L.E. was dismissed with prejudice from this case.  (Doc. No. 40.)

when it converted the Students' elementary school into a charter school, with Kenderton Charter

assuming responsibility for its operations. (*Id.* at 3–4.)

Both Students were then enrolled at Kenderton Charter throughout the 2013–14, 2014–

15, and 2015–16 school years. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 2.) However, in July

2014, Parent filed two due process complaints with ODR on behalf of Students, seeking an order

requiring Kenderton Charter to place the Students at a private school and provide each with a

compensatory education. (*Id.*) In December 2014, administrative decisions ("2014 Decisions")

were docketed that ordered Kenderton Charter to place Students at a private school for the

remainder of the 2014–15 school year, pay their private tuition, and establish a compensatory

education fund. (*Id.*; Def.'s Resp. in Opp'n Mot. Summ. J. 4.) Kenderton Charter complied with

the decisions and placed Students at Y.A.L.E. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 2–3.)

In addition, it created two education trust funds with the Advocacy Alliance Education Fund

Trust to satisfy Students' compensatory education awards.[3] (Def.'s Resp. in Opp'n Mot. Summ.

J. 5.)

Kenderton Charter paid Y.A.L.E. tuition invoices for the education services provided to

Students during the 2014–15 school year, and it maintained Students' placement at Y.A.L.E. for

the 2015–16 school year. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 3–4.) In September 2015,

Y.A.L.E. and Kenderton Charter executed contracts providing that Kenderton Charter pay

---

[3] Pendent placement and compensatory education funds are common remedies where a public school fails to provide a free appropriate public education ("FAPE"). Pendent placement provisions allow students to remain in schools or programs that provide an appropriate education, regardless of any financial constraints of the parent. *See Susquenita Sch. Dist. v. Raelee S. by and through Heidi S.*, 96 F.3d 78, 81–82 (3d Cir. 1996) (finding pendent placement is a vital part of the IDEA and impacts "virtually every case" involving an administrative challenge). Likewise, a compensatory education fund is "a remedy to compensate [] for rights the district already denied." *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 719 (3d Cir. 2010) (quoting *Lester H. v. Gilhool*, 916 F.2d 865, 872 (3d Cir. 1990)). A compensatory education fund is to be used to "place disabled children in the same position they would have occupied but for the school district's violation of IDEA." *Id.* at 718 (citing *Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)).

monthly tuition invoices to Y.A.L.E. for the education services during the 2015–16 school year. (*Id.* at 3.) Kenderton Charter paid Y.A.L.E. all of the monthly tuition invoices associated with A.H.D.'s education, except for the combined amount of $8,872.50 owed for the months of May and June 2016. (*Id.*) Similarly, Kenderton Charter failed to pay monthly tuition invoices associated with A.D.'s education for April, May, and June 2016, totaling $16,134.80, as well as a 2015–16 tuition reconciliation that totaled $4,386.00. (*Id.* at 5.) Kenderton Charter closed at the end of the 2015–16 school year and abandoned its charter. (*Id.* at 4.)

Following Kenderton Charter's closure, Students were enrolled back in the District. (*Id.*) The District continued Students placement at Y.A.L.E., and there was no disruption of their education throughout, at least, the 2016–17 school year. (Def.'s Resp. in Opp'n Mot. Summ. J. 6.) Beginning in July 2016, the District was responsible for satisfying Students' tuition invoices from Y.A.L.E. (*Id.*)

In September 2016, Parent's counsel informed PDE of the unsatisfied monthly invoices associated with Students' 2015–16 school year at Y.A.L.E. and asked PDE to fulfill Kenderton Charter's obligation to pay the tuition. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 4.) PDE informed Parent, in October 2016, that it would not pay the tuition bills Kenderton Charter owed to Y.A.L.E, stating that payment of the bills was an issue between Kenderton Charter and Y.A.L.E. (*Id.*) Sometime after, Parent's counsel provided Y.A.L.E. with information for contacting and obtaining the tuition payments from Students' trust accounts. (Def.'s Resp. in Opp'n Mot. Summ. J. 7.) In January 2017, following receipt of Parent's counsel's information, Y.A.L.E. contacted Students' trusts and requested payment of the unpaid tuition. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 4.) The following month, Y.A.L.E. contacted Parent and asked her

to authorize the trusts to pay the tuition invoices.  (*Id.*)  Parent then authorized the trusts to pay Y.A.L.E. for the unpaid tuition.  (*Id.* at 4–5.)

On February 16, 2017, Parent filed two due process complaints with ODR on behalf of A.D. and A.H.D. against PDE and Kenderton Charter.  (Def.'s Resp. in Opp'n Mot. Summ. J. 7.) The due process complaints sought reimbursement of tuition that Parent allegedly paid from Students' compensatory education trusts to Y.A.L.E. in satisfaction of the monthly tuition invoices.  (*Id.* at 8.)  On February 17, 2017, PDE asked Parent's counsel to provide copies of the receipts showing Parent paid the tuition owed to Y.A.L.E. and confirmed that: (1) the Students received the private school services; (2) Kenderton Charter was invoiced for the tuition payments, not Parent; (3) Kenderton Charter failed to make the tuition payments; (4) it was Y.A.L.E. that was a creditor seeking payments from PDE; and (5) Parent had no obligation to make tuition payments.  (Pl.'s Mem. Law in Supp. Mot. Summ. J. 5.)  PDE further requested confirmation that Parent paid Y.A.L.E. for the education services and sought copies of the payment receipts.  (*Id.*)  By check dated February 23, 2017, the trusts paid $8,872.50 from A.H.D.'s compensatory education trust and $16,134.80 from A.D.'s compensatory education trust.  (*Id.*; Def.'s Resp. in Opp'n Mot. Summ. J. 9.)

PDE and Parent submitted the due process matters to the hearing officer for a decision on stipulations of fact without the need for a hearing.  (Pl.'s Mem. Law in Supp. Mot. Summ. J. 5.) On July 6, 2017, the hearing officer issued two decisions ("2017 Decisions") relating to Students' due process matters, finding that Students did not receive the "free" education to which they were entitled and ordering PDE to pay the monthly invoices associated with Students' education services, as well as the tuition reconciliation payment associated with A.D.'s education.  (*Id.*)  The hearing officer made findings of fact, which included, *inter alia*, that the

Students did not receive "a free public education" at no cost, that the "repeated attempts by [Y.A.L.E.] to collect the [Kenderton Charter] debt creates a reasonable inference that [Y.A.L.E.] would soon take action to obstruct [Students'] free education absent payment from [Parent]," and that "PDE must step in for [Kenderton Charter] . . . because [Kenderton Charter] is defunct and unable to correct the FAPE denial."  (Def.'s Resp. in Opp'n Mot. Summ. J. 8, Ex. A ("2017 Decisions")).)[4]

On January 22, 2018, PDE filed an Amended Complaint in this Court against Parent under the IDEA and brought state law claims against Y.A.L.E. for unjust enrichment and indemnification.  As it pertains to Parent, PDE seeks reversal of the hearing officer's decisions requiring it to pay the monthly invoices and tuition reconciliation.  On April 23, 2018, we dismissed with prejudice PDE's indemnification claim against Y.A.L.E.  (*See* Doc. No. 21.) Presently, before the Court are PDE's Motion for Summary Judgment and Parent's Motion for Judgment on the Administrative Record.  Importantly, in the time since these motions were filed, Y.A.L.E. has reimbursed the Students' trusts for the amount paid by Parent and has resolved the tuition reconciliation invoice with PDE as part of a settlement agreement.  (Def.'s Resp. in Opp'n Mot. Summ. J. 9, Ex. F ("Email from Special Needs Trust"), Ex. H ("Dec. 27, 2018 Email").)  Parent now contends that this reimbursement satisfies the hearing officer's orders and PDE's claims against Parent are now moot.  (*See generally* Def.'s Reply in Supp. Mot. J. Admin. R.)

---

[4] This exhibit includes multiple documents, specifically the separate opinions by the hearing officer for A.H.D. and A.D.'s cases.  Both documents repeat pagination, therefore, for the sake of clarity, all references herein will be to the Electronic Case Filing (ECF) pagination.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court

determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## B.    The IDEA

In an IDEA case, the Court must exercise a modified de novo review, giving "due weight" to the findings of the hearing officer. *See P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009); *D.K. v. Abington Sch. Dist.*, No. 08-4914, 2010 WL 1223596, at *4 (E.D. Pa. Mar. 25, 2010) (quoting 20 U.S.C. § 1415(i)(2)(C)) ("[T]he reviewing court of 'any action brought [under IDEA] (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate.'"). The Court must consider the hearing officer's findings to be "prima facie correct" and must explain its reasons for declining to accept those findings. *See S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 271 (3d Cir. 2003). The Court must accept the credibility of such determinations, unless extrinsic evidence would justify a contrary conclusion. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). However, the Court is not "bound by the hearing officer's conclusions of law." *Abington Sch. Dist.*, 2010 WL 1223596, at *4.

The Court "must use particularized discretion in its ruling so that it will consider evidence relevant, noncumulative, and useful in determining whether Congress' goal has been reached for the child involved." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995). However, courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).

### III.  DISCUSSION

Throughout this dispute, PDE has maintained that it has no obligation to Y.A.L.E., as the issue is a matter of contract law between Y.A.L.E. and Kenderton Charter.  (Pl.'s Mem. Law in Supp. Mot. Summ. J. 1–2.)  PDE argues that the hearing officer erred in requiring PDE to reimburse Students for the Y.A.L.E. tuition.  (*Id.*)  PDE further argues that, even in the event that Y.A.L.E. was unsuccessful in obtaining its due compensation from Kenderton Charter, the charter school's obligation would not shift to PDE or Parent.  (*Id.* at 11.)  Contrarily, Parent maintains that the hearing officer was correct, but now argues that since Y.A.L.E. has reimbursed the Students' trust account, the issue is moot.  (*See generally* Def.'s Reply in Supp. Mot. J. Admin. R.)

We agree with Parent that the hearing officer correctly applied the law to this case; however, we disagree that the issue is moot, despite the reimbursement from Y.A.L.E.

#### A.  Purpose of the IDEA and PDE's Responsibilities to Students

The IDEA is intended to "promote the education of handicapped children, and was passed in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when the were old enough to 'drop out.'"  *Rowley*, 458 U.S. at 179 (alteration in original) (quoting H.R. Rep. No. 94-332, pt. 2 (1975)).  The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that the "IDEA requires that states to receive federal education funding make available a free and appropriate public education to all children with disabilities residing within their borders."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 556 (3d Cir. 2010) (citing 20 U.S.C. § 1412(a)(1)); *see also Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010).

> A "free appropriate public education" is defined within the act as
> special education and related services that: (A) have been provided
> at public expense under public supervision and direction, and
> without charge; (B) meet the standards of the State Educational
> Agency; (C) include an appropriate preschool, elementary school,
> or secondary school education in the State involved; and (D) are
> provided in conformity with the individualized education program
> required under section 1414(d).

*Charlene R. v. Solomon Charter Sch.*, 63 F. Supp. 3d 510, 512–13 (E.D. Pa. 2014).

IDEA "contemplates that such education will be provided where possible in regular public schools, with the child participating as much as possible in the same activities as nonhandicapped children, but the Act also provides for placement in private schools *at public expense* where this is not possible." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (emphasis added) (citing 20 U.S.C. § 1412(5); 34 C.F.R. §§ 300.132, 300.227, 300.307(b) (1984)). The IDEA establishes the state education agency ("SEA") as a supervisory authority over the local education agency ("LEA"), but that it is also "responsible for administering funds, setting up policies and procedures to ensure local compliance with IDEA, and filling in for the LEA by providing services directly to students in need where the LEA is either unable or unwilling to establish and maintain programs in compliance with IDEA." *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 943 (4th Cir. 1997). "[U]ltimately, it is the SEA's responsibility to ensure that each child within its jurisdiction is provided a free appropriate public education [FAPE]. Therefore, it seems clear that an SEA may be held responsible if it fails to comply with its duty to assure that IDEA's substantive requirements are implemented." *Id.* at 952; *see also Pachl v. Seagren*, 453 F.3d 1064, 1070 (8th Cir. 2006) ("The Fourth Circuit has further indicated that the state agencies may be financially responsible for the costs of private placement where the applicable local agency was not providing a free and appropriate education."); *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d

687, 696 (3d Cir. 1981) ("Both a general, congressional perception of the state's primary responsibility to provide a publicly-supported education for all children and a specific intent to centralize this responsibility underlie this explicit statutory mandate.").

Here, PDE does not challenge the finding that Kenderton Charter failed to provide Students a FAPE. Instead, PDE argues it is not responsible for the obligations made in the contract between Kenderton Charter and Y.A.L.E., due to Kenderton Charter's status as a charter school. (Pl.'s Mem. Law Mot. Summ. J. 11 ("[Kenderton Charter's] obligation to pay tuition to [Y.A.L.E.] was not somehow shifted to Parent or PDE.").) PDE provided a more detailed argument in their Response in Opposition to Y.A.L.E.'s Motion to Dismiss, arguing that the "Charter School Law provides that 'in no event shall . . . school entities or the Commonwealth be liable for any outstanding liabilities or obligations of the charter school.'" (Pl.'s Resp. in Opp'n Mot. Dismiss 7 n.2 (quoting 24 Pa. Cons. Stat. § 17-1729-A(i) (2008)).)

However, this is simply not true. Kenderton Charter, as the Students' LEA, was required by the 2014 Decisions to ensure Students' placement at Y.A.L.E. as part of its obligation to provide a FAPE. (2017 Decisions, ECF Nos. 3, 20.) By closing and relinquishing its charter, that obligation shifted to PDE, the SEA. *See Lejeune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785, 798 (E.D. Pa. 2018) ("[A] consensus has emerged 'in this district that the SEA assumes responsibility for a failed charter school's FAPE violations'"); *Charlene R.*, 63 F. Supp. 3d at 520 ("[U]nder the Act, the SEA bears ultimate responsibility for ensuring that a child receives the FAPE that he or she is due."); *see also R.J. v. Rivera*, No. 15-5735, 2016 WL 4366987, at *3 (E.D. Pa. Aug. 16, 2016) (holding SEA responsible for attorney's fees incurred in litigating a child's claim for denial of FAPE against a defunct charter school LEA).

The fact that the Students' LEA, at the time, was a charter school does not absolve PDE of its responsibility. As this Court has previously stated, provisions preventing charter school indebtedness or obligations flowing to the SEA "are in clear conflict with the congressional intent behind SEA liability spelled out by the Third Circuit in *Kruelle*." *Charlene R.*, 63 F. Supp. 3d at 520. "[C]harter schools present a unique challenge under the IDEA. When public school districts encounter financial difficulties, they do not simply cease to exist, but rather merge or consolidate. Charter schools, in contrast, can simply disappear." *Id.* at 521. "Under 34 C.F.R. § 300.209(c), public charter schools that are LEAs are to be held to the same standards as all other LEAs." *Id.*

The Supreme Court of the United States ("Supreme Court") has held that reimbursement for parents' expenses, including tuition, is an appropriate relief under § 1415(e)(2). *See Burlington*, 471 U.S. at 369 (holding IDEA's grant of "appropriate" relief includes tuition reimbursement). Likewise, the Third Circuit has consistently held that when the "state fails to provide a [FAPE], it must reimburse parents for resulting private school costs." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000)); *see also Bayonne*, 602 F.3d at 557 ("When a state is unable to provide a free and appropriate public education to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs.").

Therefore, the hearing officer's decision to require PDE to reimburse Parent for the tuition owed by Kenderton Charter and resolve the outstanding tuition reconciliation invoice with Y.A.L.E. was correct.

**B.  PDE's Reliance on *Olivia B.* is Misguided**

Throughout its briefing, PDE relies heavily on a case decided by this Court, *Olivia B. v. Sankofa Acad. Charter Sch.*, No. 14-867, 2014 WL 3797282 (E.D. Pa. Aug. 1, 2014) (Kelly, J.), for the proposition that "a closed charter school's failure to pay a student's private school tuition debt is not an actionable federal IDEA claim and is instead a contractual issue between the charter school and private school that does not extend to PDE or Parent." (Pl.'s Mem. Law in Supp. Mot. Summ. J. 13.) PDE went so far as to reference the *Olivia B.* decision in its letter informing Parent that it would not pay the outstanding tuition owed by Kenderton Charter. (*Id.* at 4.)

However, while the actors in *Olivia B.* are indeed similarly-situated to those in this case, the circumstances presented here are so distinct as to make *Olivia B.* inapplicable. In *Olivia B.*, the plaintiff's child suffered from learning disabilities that required specialized education support and accommodations. *See Olivia B.*, 2014 WL 3797282, at *2. The child's local school district funded his education at a public charter school. *See id.* The charter school was the child's LEA. *See id.* The plaintiff filed a due process complaint alleging the charter school had denied her son FAPE over the course of four years. *See id.*

Importantly, after initiating the due process complaint, the parties reached a settlement agreement during a statutorily-required resolution session prior to the scheduled hearing at ODR. *See id.*; *see also* 20 U.S.C. § 1415(f)(1)(B) (requiring preliminary meeting between parents and LEA to attempt to resolve the complaint). As part of this agreement, the charter school agreed to fund plaintiff's placement at a private school that would be able to provide the required specialized education, and the plaintiff "relinquished her claims" in exchange for the charter school's funding. *See Olivia B.*, 2014 WL 3797282, at *2–3. However, less than a year later,

the charter school ceased making tuition payments to the private school on behalf of the plaintiff. *See id.* Upon learning that the outstanding tuition totaled over $65,000, plaintiff filed, and was granted, a motion for a temporary restraining order ("TRO") mandating that the charter school "make all tuition payments and comply with all other financial obligations necessary to preserve [the plaintiff's] pendent special education placement at the [private school]." *Id.* The charter school eventually closed and had its charter revoked by the local school district. *See id.* Shortly thereafter, the plaintiff amended the complaint to include claims against PDE for failing to provide FAPE and seeking funding for the plaintiff's continued placement at the private school. *See id.* at *4, 6.

However, on consideration of cross-motions for a TRO filed by the plaintiff and a motion to dismiss filed by the defendants, this Court found that the plaintiff could not sustain a claim under the IDEA. *See id.* at *6–7. Instead, we found that the case was based in contract law. *See id.* at *10. Citing to the Third Circuit, we held that "when a 'settlement agreement was voluntarily and willingly entered by the parties,' the agreement constitutes 'a binding contract between the parties and should have been enforced as written.'" *Id.* (quoting *D.R. v. E. Brunswick Bd. of Educ.*, 109 F.3d 896, 898 (3d Cir. 1997)); *see also* 20 U.S.C. § 1415(f)(1)(B)(iii) ("In the case that a resolution is reached to resolve the complaint at a [preliminary meeting], the parties shall execute a legally binding agreement that is . . . enforceable in any State court of competent jurisdiction or in the district court of the United States."). "In such cases, the appropriate law to apply is state contract law." *See id.* (citing *J.K. v. Council Rock Sch. Dist.*, 833 F. Supp. 2d 436, 452 (E.D. Pa. 2011)); *see also Robert v. Cobb Cty. Sch. Dist.*, 279 F. App'x 798, 801 (11th Cir. 2008) ("Plaintiffs prevailed only on a state-law breach of contract claim . . . . [P]laintiffs' breach of settlement agreement claim did not require

any adjudication of plaintiffs' rights under the IDEA."); *Bowman v. Dist. of Columbia*, No. 05-1933, 2006 WL 2221703 (D.D.C. Aug. 2, 2006) ("Although the parties' underlying dispute [involving enforcement of a settlement agreement] relates to and touches on the [IDEA], the complaint, ultimately, is a simple breach of contract claim. Breach of contract claims are governed by state law.").

Looking again at the case at hand, there is a clear distinction between the contract agreed to by Kenderton Charter and Y.A.L.E. and the settlement agreement reached in *Olivia B.* Specifically, in reaching a settlement agreement, the parties in *Olivia B.* decided to forgo a hearing before a hearing officer and voluntarily agreed that in exchange for the charter school funding the student's private school tuition, the parent would relinquish her claims under the IDEA. *See Olivia B.*, 2014 WL 3797282, at *3. Thus, the impetus of the charter school's liability to pay the private school tuition stemmed from this voluntary settlement agreement and, as we explained in our opinion, the charter school's failure to pay said tuition was a direct breach of its obligations to the parent made in that agreement. *See id.* at *10 (finding the only injury "arises from [the defendant's] failure to adhere to its obligations memorialized in the [s]ettlement [a]greement"). We stated further that, according to the statute itself, the case did not implicate the IDEA and was, instead, a matter of contract law. *See id.* The only injury was to the private school, as a third-party beneficiary to the settlement agreement; however, because it had not initiated any action for relief, the plaintiff could not do so on its behalf. *See id.*

However, here, as PDE has repeatedly stated, the contract at issue was made between Kenderton Charter and Y.A.L.E. and entered into "[p]ursuant to the hearing officer decisions" provided during the 2014 Decisions. (Pl.'s Mem. Law in Supp. Mot. Summ. J. 2, 5, 10, 12.) Therefore, it is clear that the obligation to pay Students' tuition originated from the 2014

Decisions, not a settlement agreement between Kenderton Charter and Parent. (*See id.* at 2; 2017 Decisions, ECF Nos. 3, 20.) By breaching the contract with Y.A.L.E., Kenderton Charter was not just in violation of the contract, but also the 2014 Decisions. Contrary to *Olivia B.*, the injuries in this case are not just the monetary value of the tuition, but also a failure to comply with the 2014 Decisions. *See D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 273 (3d Cir. 2014) (finding LEA's refusal to set up compensatory fund was in violation of hearing officer's order).

The Third Circuit has held that "parties who prevail at the administrative level, but are later faced with a noncompliant [LEA], . . . are 'aggrieved' for purposes of the IDEA and may properly pursue such claims in court." *See id.* at 278; *see also Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 116 (1st Cir. 2003) (concluding that a disabled student and his parents qualified as "parties aggrieved" under the IDEA, even though they prevailed at their administrative hearing, where the school district neither appealed nor complied with its continuing obligations under the administrative order); *Ida D. v. Rivera*, No. 17-5272, 2018 WL 6046456, at *9 (E.D. Pa. Nov. 19, 2018); *Lejeune*, 327 F. Supp. 3d at 790–91, 793–95 (finding "[a] claim to enforce the [h]earing [o]fficer's decision necessarily forms 'part of the same case or controversy' as a claim to enforce" post-hearing agreement designed to implement decision). In reaching this conclusion, the Third Circuit held that "[t]he [IDEA] provides that 'any party aggrieved by the findings and decision' of a local hearing officer may appeal to the state educational agency. A hearing decision that is not appealed is final." *D.E.*, 765 F.3d at 276 (quoting *Robinson v. Pinderhughes*, 801 F.2d 1270, 1272 (4th Cir. 1987)). Therefore, "Congress could not have intended to leave plaintiffs without an IDEA statutory remedy when they succeed before the hearing officer and the school system does not appeal the administrative decision but simply fails

to fulfill a continuing obligation to provide services." *Id.* at 277 (quoting *Nieves-Marquez*, 353 F.3d at 116).

Kenderton Charter did not appeal and actively began compliance with the 2014 Decisions, requiring it to establish compensatory education trusts and place Students' at Y.A.L.E. However, by failing to continue to pay the Students' tuition at Y.A.L.E., Kenderton Charter was no longer in compliance and Parent is entitled to bring an IDEA claim in this Court.[5] *See id.* at 277–78. The breach of contract by Kenderton Charter of the tuition agreement with Y.A.L.E. was not a breach of a statutorily-defined settlement agreement reached during the course of a due process proceeding, as in *Olivia B.* Instead, it is a violation of the 2014 hearing officer's decisions and an actionable claim under the IDEA.

For these reasons, *Olivia B.* is inapplicable to this case, and we are not persuaded by PDE's arguments based on its analysis.

### C. Required Modifications of the 2017 Decisions

#### 1. Y.A.L.E.'s Reimbursement does not Render the 2017 Decisions Moot

We now turn to the appropriate remedy in this case. According to the 2017 Decisions, the hearing officer found that:

> Using compensatory funds to satisfy the LEA's and SEA's preexisting duties is contrary to the make-whole philosophy announced in *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601,

---

[5] The Third Circuit in *D.E.* devotes significant analysis in its opinion to the question of whether a "prevailing party" must exhaust all administrative remedies before pursuing enforcement of a hearing officer's decision in federal court. *D.E.*, 765 F.3d at 276–77. The Third Circuit found that requiring another administrative proceeding would incentivize losing LEAs to "drag out the administrative process, not appeal administrative orders, not to announce their intentions to refuse to comply with those orders, and generally not to comply." *Id.* at 277 (quoting *Nieves-Marquez*, 353 F.3d at 116). Therefore, the Third Circuit concluded that a subsequent administrative hearing is not required for a prevailing party to enforce the hearing officer's decision. *See id.* at 278.

Here, Parent did commence a subsequent administrative hearing, the 2017 Decisions at issue now. We take care to note that the 2017 Decisions essentially enforce the 2014 Decisions, albeit against PDE instead of the now defunct Kenderton Charter. Though this administrative proceeding was not required, we believe that the Third Circuit's analysis in *D.E.* applies equally to IDEA claims seeking enforcement of a hearing officer's decision through an administrative proceeding or in the district court.

614 (3d Cir. 2015). Using compensatory education funds, as stipulated [by the parties], essentially negates the Student[s'] right to reach the path to significant learning and meaningful benefit. [Furthermore], from a contract perspective, PDE would be unjustly enriched, if the Trust and [Y.A.L.E.] are not reimbursed. . . . As the case law stands today, PDE as the SEA is the responsible public agency. Therefore, reimbursing the trustee[s] and [Y.A.L.E.] for FAPE related costs here is not a novel remedy. Accordingly, PDE is directed to pay [the trustee of A.H.D.'s trust the sum of $8,872.50 and the trustee for A.D.'s trust the sum of $16,134.80.] PDE is also directed [to] pay [Y.A.L.E.] the sum of $4,386.00.

(2017 Decisions, ECF Nos. 17, 34.)[6]

While we agree with the decision of the hearing officer, it is no longer applicable to the facts as they now stand in this case. Y.A.L.E. has reimbursed the Students' trusts for the amount paid by Parent as a condition of dismissal from this suit. (Email from Special Needs Trust.) As the trusts have now been made whole, Parent has asked that the case be deemed moot. (Def.'s Reply in Supp. Mot. J. Admin. R. 1 (citing *Gov't of V.I. v. Ferrer*, 275 F.2d 497, 500 (3d Cir. 1960)).) Specifically, Parent argues that the hearing officer's order has been satisfied and that PDE no longer needs to overturn the 2017 Decisions. (*Id.*)

PDE argues that the case is not moot. PDE asserts that, despite payment by a third party, the hearing officer's order requiring it to reimburse the trusts remain until the Court reverses. (Pl.'s Reply in Supp. Mot. Summ. J. 1.) Furthermore, PDE claims that the administrative decision is based on an error of law and will remain unresolved, and will also entitle Parent to

---

[6] As both A.H.D and A.D.'s cases are almost identical, the hearing officer repeated most of his findings verbatim throughout both of his opinions, including this quoted paragraph in which he issues his relief determination. (*Compare* 2017 Decisions, ECF No. 17, *with id.* at ECF No. 34.) For the sake of clarity, both paragraphs are combined. However, the hearing officer inadvertently transposed the value owed to A.D.'s trust to that of A.H.D.'s trust. The amount owed to A.H.D.'s trust should have read $8,872.50, as reflected above. This is verified by the hearing officer's own findings on ECF No. 9, para. 28 ("The May 2016 and June 2016 invoices total $8,872.50."), ECF No. 10, para. 41 ("PDE obtained a copy of a check dated February 23, 2017 in the amount of $8,872.50, from Advocacy Alliance Education Fund Trust . . . payable to [Y.A.L.E.] . . . ."), as well as PDE's Statement of Undisputed Facts, (Pl.'s Mem. Law in Supp. Mot. Summ J., Ex. 2, ¶¶ 45–47), and Parent's Response in Opposition to PDE's Motion for Summary Judgment, (Def.'s Resp. in Opp'n Mot. Summ. J. 7 n.5).

attorney's fees and costs as a "prevailing party."  (*Id.* at 1–2.)  We agree that Y.A.L.E.'s reimbursement of the trusts does not make this case moot; however, because PDE's argument again rests upon the hearing officer's disregard of *Olivia B.*, we reach our conclusion on different grounds.  (Pl.'s Reply in Supp. Mot. Summ. J. 2–3 ("The capable-of-repetition doctrine applies where a party can make a reasonable showing that it will be subjected to the same claims. . . . Dismissing PDE's appeal as moot will allow Defendants, other potential defendants, and Defendants' counsel to elect to disregard known court decisions [*Olivia B.*] . . . .").)[7]

## 2.    *Modifications to the 2017 Decisions are Appropriate and Necessary*

Y.A.L.E.'s reimbursement of the Students' trusts does not absolve PDE of its obligation to pay Students' outstanding tuition.  See *supra* Section III-A.  Accordingly, we find that we must modify the hearing officer's 2017 order to the effect that PDE is required to pay the sum of $25,007.30 in outstanding tuition, the amount originally owed to A.H.D. and A.D.'s trusts under the 2017 Decisions, directly to Y.A.L.E.  *See Burlington*, 471 U.S. at 369 ("The statute directs the court to 'grant such relief as [it] determines is appropriate.'  The ordinary meaning of these words confers broad discretion on the court.  The type of relief is not further specified, except that it . . . be 'appropriate' in light of the purpose of the Act."); *D.E.*, 765 F.3d at 273 ("[T]he District Court ha[s] within its power to formulate an appropriate remedy that would effectuate the purpose of the IDEA *and* the hearing officer's award.").  In total, PDE is required to pay Y.A.L.E. the same amount it was required to reimburse the Students' trusts following the 2017 Decisions.[8]

---

[7] As stated in Section III-B, the 2017 Decisions correctly ignored this Court's *Olivia B.* decision as applied to this case.  Therefore, seeing as we have, in fact, reviewed this issue, the "capable of repetition, yet evading review" doctrine does not apply.  *See Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (establishing elements of doctrine as "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again").

In reaching this modification, we look to the well-established *Burlington-Carter* test. *See Florence Cty. Sch. Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 12–16 (1993); *Burlington*, 471 U.S. at 369–70, 373–74. Under the test, the party seeking reimbursement for private school expenditures must show: (1) the public school did not provide FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement. *See id.* The first and second prongs are undisputed in this case; therefore, we focus on the third prong. (Pl.'s Mem. Law in Supp. Mot. Summ J., Ex. 2, ¶¶ 16–18, 24.) Regarding the third prong, we must examine the statutory text concerning the purpose of the IDEA. *See Ferren C.*, 612 F.3d at 717 (citing *Burlington*, 471 U.S. at 369) ("In evaluating whether the District Court's grant of equitable relief under the IDEA was appropriate, we must determine whether the relief granted furthers the [stated] purposes of the Act."). In particular, we focus on two key provisions of the Act:

> The purposes of this chapter are --
>
> (1)(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;
>
>             \*       \*       \*
>
> (3) to ensure that educators and parents have the necessary tools to improve education results for children with disabilities by supporting system improvement activities; coordinated research and personnel preparation . . . .

20 U.S.C. § 1400(d).

---

[8] PDE appears to have resolved the matter of the $4,386.00 tuition reconciliation bill owed to Y.A.L.E. PDE's Reply Brief characterizes Y.A.L.E.'s dismissal from this suit as conditioned on a waiver of an "outstanding tuition invoice." (Pl.'s Reply Br. In Supp. Mot. Summ. J. 1.) In a letter dated December 27, 2018, counsel for PDE informed counsel for Parent that the tuition reconciliation invoice, in the amount of $4,386.00, had "been resolved" with Y.A.L.E. (Dec. 27, 2018 Email.) The parties do not provide any clarification concerning this resolution or the nature of any agreement reached between PDE and Y.A.L.E.

       Therefore, for the purposes of deciding these motions, we construe this resolution to include only the $4,386.00 tuition reconciliation bill. To the extent PDE argues that "outstanding tuition invoice" constitutes a waiver of the entire amount of outstanding tuition, we disagree.

The 2017 Decisions addressed both of these goals.  Parent initiated the 2017 due process complaints because she was forced to pay, via the educational trusts, the outstanding tuition owed to Y.A.L.E.  (2017 Decisions, ECF Nos. 16, 33 ("[T]he repeated attempts by [Y.A.L.E.] to collect [the debt] create[d] a reasonable inference that [Y.A.L.E.] would soon take action to obstruct the Student[s'] 'free' education.").)The hearing officer found that Students "[were] denied a 'free' appropriate public education when the trustee paid the invoice."  (*Id.* at ECF Nos. 14, 31.)  The hearing officer reasoned that using the compensatory funds, established in the 2014 Decisions, negated Students' right to significant learning and meaningful benefit.  (*Id.* at 17, 34.) In addition, "from a contract perspective, PDE would be unjustly enriched, if the [trusts] and [Y.A.L.E.] [were] not reimbursed."  (*Id.* at 17, 34 (finding the compensatory funds were a distinct and separate remedy from the pendent placement award in the 2014 Decisions and that the former could not be used to satisfy the latter).)  Therefore, by requiring PDE to reimburse the trusts for the cost of the outstanding tuition and satisfy the tuition reconciliation bill with Y.A.L.E., the hearing officer ensured Students would have received FAPE and Y.A.L.E. would have been appropriately compensated for its educational services.  (*Id.* at 17 & n.15 (quoting *Param Techs., Inc. v. Intelligent Home Solutions, Inc.*, No. 04-1348, 2005 WL 2050446 (E.D. Pa. Aug. 25, 2005)) (finding that failure to fulfill payment to Y.A.L.E. may result in a *quantum meruit* claim, meaning "recovery under quasi-contract . . . where the parties have not fixed the value of the service to be provided, but it would be unjust to allow the beneficiary to retain a benefit for which there was an implied promise to pay")); (Def.'s Mot. to Suppl. Admin. R., Ex. B ("Email from Y.A.L.E.") ("We are a private school for students with special needs and rely upon the tuition from the sending districts and charters who send students to our school to keep operating.").)

However, Y.A.L.E.'s reimbursement of the trusts during the course of this litigation has since changed the underlying basis for the hearing officer's order. In keeping with the goals of that order, our decision to modify is two-fold. First, "free" is only one element of FAPE. *See* 20 U.S.C. § 1401(9)(A). Section 1401(9)(A) explicitly states that "[t]he term 'free appropriate public education' means special education and related services—have been provided *at public expense*, under public supervision and direction, and without charge." *Id.* (emphasis added). The issue of whether public funding is required under the IDEA has been addressed recently by the United States Courts of Appeals for the First and Ninth Circuits ("First Circuit" and "Ninth Circuit"). *See K.L. v. R.I. Bd. of Educ.*, 907 F.3d 639, 642 (1st Cir. 2018) (finding that, absent a statutory definition of "public education," it can be inferred that Congress intended it to have a "commonly understood meaning"); *E.R.K. ex rel. R.K. v. Haw. Dep't of Educ.*, 728 F.3d 982, 988 (9th Cir. 2013) (finding the IDEA definition of FAPE is "consistent with the plain meaning of 'free public education'"). The *K.L.* court held "the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress's intent." *K.L.*, 907 F.3d at 642 (quoting *United States v. Chuong Van Duong*, 665 F.3d 364, 366 (1st Cir. 2012)). The court stated the "two core attributes of 'public education' that are undisputed [are]: (1) a significant level of state or local governmental funding, and (2) the public administration or oversight of the education services." *Id.*; *see also E.R.K.*, 728 F.3d at 988 (citing Webster's Third New Int'l Dictionary 1836 (1968)) ("[C]onsistent with the plain meaning of 'free public education . . . ,' [a] 'public' institution is one that is 'accessible . . . to all members of the community' and which 'provid[es] services to the people . . . under some degree of civic or state control.'").

Although the Third Circuit has not specifically addressed this issue, we find its previous rulings consistent with the First and Ninth Circuits' analyses of public funding. *See M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014) ("The operative placement could be either a public school or a private school that the local district was financing to satisfy the requirement that every child be given a *free*, appropriate education."); *Susquenita Sch. Dist. v. Raelee S. By and Through Heidi S.*, 96 F.3d 78, 84 (3d Cir. 1996) ("It is undisputed that once there is state agreement with respect to pendent placement, *a fortiori*, financial responsibility on the part of the local school district follows."); *see also Burlington*, 471 U.S. at 369 ("[T]he Act provides for placement in private schools at public expense . . . .").

While Y.A.L.E.'s reimbursement effectively resolved the issue of whether Students' education was "without charge," it merely shifted the payor from the trusts to Y.A.L.E., such that the private school absorbed the cost of Students' tuition. (Pl.'s Reply Br. in Supp. Mot. Summ. J. 1 ("[Y.A.L.E.] agreed to return the funds it received from students' educational trusts and waived payment of an outstanding tuition invoice.").) As the facts now stand, Students received no public funding for their education during the months at issue.

Second, PDE has no right to keep federal funds that should have otherwise been used to fund Students' education. Ideally, the IDEA creates a

> three-tiered funding, administration, and implementation scheme, under which the state must submit a plan of compliance to the Secretary of Education which provides federal IDEA funds to the state. The state is then responsible for administering the funds on the state level, including distribution of federal funds to [LEAs] and the implementation of policies and procedures to ensure that each LEA expends the funds in a manner consistent with the purpose and substantive provisions of IDEA.

*Gadsby*, 109 F.3d at 942–43 (internal citations omitted) (citing 20 U.S.C. §§ 1413(a), 1414(b)).

Additionally, the IDEA provides a stopgap measure that states that "[w]hen an LEA is 'unable to establish and maintain programs of free appropriate public education that meet the requirements of [the IDEA],' the SEA must 'provide special education and related services directly to the children with disabilities.'" *Lejeune*, 327 F. Supp. 3d at 789 & n.3 (quoting 20 U.S.C. § 1413(g)).

In this case, the system broke down. Once PDE realized that Kenderton Charter was no longer able to maintain Students' tuition at Y.A.L.E, it should have stepped in to provide the federal funding directly to Y.A.L.E. or as a reimbursement to Parent. If PDE had not yet provided the funds to Kenderton Charter for use in funding Students' Y.A.L.E. tuition, it had no right under the IDEA to otherwise keep the money designated for Students.[9] *See* 34 C.F.R. §§ 300.162(c)(1), 300.164(a)) ("[F]unds paid to a state [for assistance for the education of all children with disabilities] must be used to supplement the level of Federal, State and Local funds . . . expended for special education and related services provided to children with disabilities."); *see also Gadsby*, 109 F.3d at 953 ("[T]he SEA is ultimately responsible for the provision of a free appropriate public education to all of its students and may be liable for the state's failure to assure compliance with the IDEA."); *Kruelle*, 642 F.2d at 697 (placing "the burden for coordinating efforts and financial arrangements" on the SEA).

Without this modification to the 2017 Decisions, the full burden of funding Students' five-months-worth of education would fall to Y.A.L.E. (Def.'s Resp. in Opp'n Mot. Summ. J. 9 ("[Y.A.L.E.'s] tuition reimbursement check for $8,872.50 was deposited into [A.H.D.'s] special needs trust, and [Y.A.L.E.'s] tuition reimbursement check for $16,134.80 was deposited into

---

[9] Though not asserted by the parties, it is conceivable that PDE had already distributed the funds to Kenderton Charter before it closed and Kenderton Charter failed to make the appropriate payments to Y.A.L.E. If this is the case, we make no finding regarding whether PDE may seek reimbursement from Kenderton Charter.

[A.D.'s] trust.").) This is contrary to Congress' clear intention that a free appropriate education be "provided at public expense, under public supervision and direction, and without charge." 20 U.S.C. § 1401(9)(A); *see also K.L.*, 907 F.3d at 642 (interpreting Congress's intent for public education); *D.E.*, 765 F.3d at 273 (considering public policy principles of remedy). Moreover, the Third Circuit in *D.E.* found that it was against public policy for the availability of IDEA remedies to depend on whether a "student or his parents have the financial means to front the costs of those remedies." *See D.E.*, 765 F.3d at 273 (citing *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 497 (3d Cir. 2012)). Therefore, it follows that such a remedy should also not be contingent on whether the only school capable of providing FAPE can "front the cost" of its students. *See Carter*, 510 U.S. at 14 ("[I]t hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place.").

### 3. *Direct Payment to Y.A.L.E. by SEA is Appropriate*

We reiterate the finding in our April 2018 Memorandum Opinion that the IDEA prohibited Y.A.L.E. from seeking payment from Students' parents. (Doc. No. 20.) However, that does not change the fact that the core of this case is a claim for reimbursement. More specifically, it is akin to a "direct payment" remedy, as highlighted by the United States District Court for the Southern District of New York. *See S.W. v. N.Y.C. Dep't of Educ.*, 646 F. Supp. 2d 346, 359 (S.D.N.Y. 2009).

In *S.W.*, a parent unilaterally withdrew her child from public school because she disagreed with the school's independent evaluation plan ("IEP") and enrolled him in a private school. *Id.* at 354. On appeal from the administrative process, the parent sought direct payment

by the school district to the private school in the amount of accrued tuition. *Id.* In finding the parent had standing under the IDEA, the court relied on her son's right to be provided with a FAPE at public expense:

> The IDEA requires school districts to provide disabled children with a FAPE, which is defined by the statute, in relevant part, as "special education and related services that . . . have been provided at public expense . . . ." Here, it is undisputed that [the child] received an appropriate education at [the private school], but importantly, that education was not provided at public expense. If the Court orders the [district] to pay [the child's] tuition to [the private school], as [the parent] requests, [the child] will have received a FAPE, that is, an appropriate education at public expense.

*Id.* at 453–54 (quoting 20 U.S.C. § 1401(9)).

The United States Court of Appeals for the Second Circuit adopted the availability of direct payment, though declined to address whether the lack of publicly-funded education, alone, is a "redressable" injury under the IDEA. *E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 453–54 (2d Cir. 2014) (finding that even where parent was not legally liable for cost of private school tuition, direct payment was warranted). Importantly, however, it found that:

> [i]ndeed, where the equities call for it, direct payment fits comfortably within the *Burlington-Carter* framework: like reimbursement, direct payment to the private school that provided the required educational program "merely requires [the school district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP."

*Id.*

In the present case, the equities favor direct payment of Students' tuition by PDE. *See id.* Here, Kenderton Charter was obligated to pay Students' tuition not only through its contract with Y.A.L.E., but also to be compliant with the 2014 Decisions. By failing to do so, Parent had a right of redressability through a court action or administrative process. The hearing officer was

correct to require PDE to reimburse the Students' trusts in order to provide FAPE. Likewise, now that the trusts have been reimbursed by Y.A.L.E., our decision to modify requiring that PDE directly pay Y.A.L.E. is entirely appropriate and conforms the hearing officer's order with the purposes of the IDEA, and the factual development of this case. *See Burlington*, 471 U.S. at 369; *D.E.*, 765 F.3d at 273.

Therefore, PDE's motion for summary judgment is denied and Parent's motion for judgment on the administrative record is granted to the extent it is consistent with this modification of the hearing officer's order.

## IV.    <u>CONCLUSION</u>

For these reasons, the Court finds that there is no clear error in the hearing officer's decisions. Affording those decisions their due weight, the Court hereby affirms the administrative decisions made by the hearing officer and will not disturb the factual findings and conclusions of law, except as modified to direct PDE to pay the amount of $25,007.30 directly to Y.A.L.E. to satisfy Students' outstanding tuition. The Court denies Plaintiff's Motion for Summary Judgment and grants Defendants' Motion for Judgment on the Administrative Record to the extent consistent with the described modifications.

An appropriate Order follows.